# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J.  Fisher, Jr.                                                      Elisabeth A. Shumaker
Clerk                                                                        Chief Deputy Clerk

September 19, 1996


**TO:** ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:** 95-6056, Chiles v. Ceridian Corporation
September 18, 1996 by The Honorable Carlos F. Lucero


Please be advised of the following correction to the captioned decision:

On page 26, in the seventh line, the word defendents' is misspelled and should read defendants'.

Please make the appropriate corrections to your copy.

Very truly yours,

Patrick Fisher, Clerk



Trish Lane
Deputy Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| LEO W. CHILES, GLORIA HERREN, HELEN L. BYRD, JOY L. OLEO, PHYLLIS McMILLAN, ROBERT D. HUNTER, BARBARA JEFFRIES, GLORICE BIGLOW, JACQUELINE STEELE, | No. 95-6056 |

     Plaintiffs - Appellants,

v.

CERIDIAN CORPORATION; SEAGATE TECHNOLOGIES, foreign corporations,

     Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-93-1715-D)**

---

Mark Hammons of Hammons & Associates, Oklahoma City, Oklahoma, for Plaintiffs - Appellants.

Charles W. Ellis (G. Neal Rogers with him on the brief) of Lawrence & Ellis, P.A., Oklahoma City, Oklahoma, for Defendants - Appellees.

---

Before **BALDOCK**, **HENRY** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Plaintiffs, a certified class of employees who receive benefits under a long term disability plan, appeal from summary judgment denying them health care benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The issues presented are whether the plaintiffs have vested rights to company-paid health insurance as long as they remain disabled and, if not, whether the plan administrator had sufficient reason to change the plan and require the covered employees to pay their own premiums for coverage. The district court found that these benefits were not vested and that the employer properly exercised its right to discontinue paying the premiums.

On appeal, both parties point to the plan documents setting out the plaintiffs' benefits and, particularly, the summary plan descriptions ("SPDs") describing those plans; each finds language supporting its interpretation. Our inquiry is guided by these documents and federal ERISA law. Our jurisdiction is founded on 28 U.S.C. § 1291.

## BACKGROUND

The plaintiffs are former employees of Imprimis, a division of Control Data. Control Data provided its nonunionized employees, including those working for Imprimis, benefits under a number of ERISA plans. The plans gave employees the option of enrolling in health and dental coverage, life insurance and disability benefit insurance. Enrolled employees made periodic payments for their coverage. Control Data maintained

plan documents for each of the four benefit programs (plan "master documents"), and provided covered employees with SPDs, which we are told describe in language comprehensible to the average participant the terms and conditions of the plan.

In September 1989 Control Data sold Imprimis to Seagate Technology. Prior to the sale, plaintiffs had all been deemed disabled and were receiving long term disability benefits under the Control Data Long Term Disability Plan ("LTD Plan"). The summary plan description at the time of sale provided:

> While on Long-Term Disability Status the company will pay the premiums for all the company-sponsored benefits (medical, life, and dental) for which you and your dependents were enrolled before your disability began. The company will continue paying all premiums until you and your dependents are no longer eligible for the plans.

As part of the sale Seagate agreed to administer the plaintiffs' rights "according to the terms of the Control Data Plan," and Control Data transferred to Seagate assets to cover projected liabilities from the LTD Plan. Seagate thereafter created a new LTD plan ("Seagate LTD Plan") to cover the employees that had participated in the Control Data plan, but did not provide coverage for new participants. The Seagate LTD Plan thus covered a closed set of participants.

In a letter to employees regarding the impending sale of Imprimis to Seagate, Control Data notified plaintiffs that it would continue the health, dental and life insurance plans after the sale, and that "[a]s provided under the current program, Control Data will continue to pay the premiums on your behalf for these plans. Under the program, Control

Data has reserved the right to change or cancel it at any time." Aplt. App. 217. While all aspects of the administration of the LTD Plan transferred to Seagate, Control Data continued to administer the health, dental, and life insurance plans. Sometime after the sale of Imprimis, Control Data changed its name to Ceridian Corporation. In September 1992 Control Data/Ceridian informed the former Imprimis employees receiving LTD benefits and enrolled in health care coverage that, beginning in January 1993, the health care plan would be amended to require that plaintiffs pay the same portion of the health care premiums as Control Data/Ceridian's active employees.

The company-paid health care premiums claimed by the plaintiffs are referenced in both the documents of Control Data's Health Care Plan and its LTD Plan. Although plaintiffs also claim that they have vested rights to company-paid dental and life insurance coverage as long as they qualify for long term disability, we focus on the health care coverage because it is the only plan for which plaintiffs are now required to pay under the disputed amendment. The Health Care Plan master document specifically provides that the employer will bear the entire cost of health care coverage during any period an employee is on approved disability. This provision is reflected in the SPD summarizing the Control Data Health Care Plan.

Under the LTD Plan, employees who qualify for long term disability are entitled to a benefit of up to 60% of their previous salary. Unlike the master plan document for the Health Care Plan, the LTD Plan master document does not refer to health care coverage

during disability. Although the master document is silent, in addition to the SPD provision quoted above, the LTD Plan SPD also states that the company promises to continue to pay premiums on company sponsored benefits while the employee is on "Rehabilitation Status." A chart in the SPD reiterates the company's promise to pay the employee's premium while on disability and rehabilitation. The plan documents for the dental and life insurance plans also note that the cost of coverage for those enrolled would be paid by Control Data during the employee's disability.

All of Control Data's plans contain amendment and termination provisions. The SPD to each of the four plans states: "Control Data expects to continue the [Long-Term Disability/Health/Dental/Life] Plan indefinitely, but must reserve the right to change or discontinue it if it becomes necessary. This would be done only after careful consideration." This summary is not a verbatim recitation of the rights to amend or terminate found in the master plan documents. Those documents allowed plan amendment "if deemed advisable" by Control Data, and retained the employer's right to terminate "at any time." The LTD Plan's reserved rights provision includes an additional feature not found in the documents for the medical, dental, or life insurance benefit plans. The LTD Plan master document notes that, notwithstanding the termination of the LTD Plan, a participant who was totally disabled on the effective date of termination "shall continue to receive benefits in accordance with the terms of the Plan." This promise is reflected in the SPD, which states: "If the group Long-Term Disability Plan terminates,

- 5 -

and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claim for such benefits will continue as long as you remain totally disabled as defined by the plan."

Plaintiffs brought this action under 29 U.S.C. § 1132(a)(1)(B) on behalf of "former employees of Imprimis Technology, Inc. who were, as of January 1, 1993, receiving long-term disability (LTD) benefits pursuant to the LTD plan administered by Seagate and who were covered by the health care plan administered by Ceridian."  They sought relief against defendants for breach of contract and fiduciary duties.  By agreement of the parties, the district court certified the class.[1]  Both parties moved for summary judgment.  The district court granted defendants' motion and entered judgment against plaintiffs.  Plaintiffs timely appealed.

## DISCUSSION

We review the grant of summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c).  James v. Sears, Roebuck & Co., 21 F.3d 989, 997-98 (10th Cir. 1994).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In applying the standard, we construe the factual record and all reasonable inferences from the record in the light most favorable to

---

[1]  A separate class of Control Data/Ceridian employees has been certified in a separate action.  Barker v. Ceridian Corp., 918 F. Supp. 1298 (D. Minn. 1996).  This class specifically excludes the instant plaintiffs, and involves disabled participants in the LTD plan who were not employees of Control Data's Imprimis division.

the party opposing summary judgment. <u>Blue Circle Cement, Inc. v. Board of County Comm'rs</u>, 27 F.3d 1499, 1503 (10th Cir. 1994).

We turn to plaintiffs' claimed errors. First, they argue that by its terms, the LTD Plan vests in an employee the right to have health insurance premiums paid by the company when she qualifies for long-term disability status. Stated in a different fashion, once the LTD benefits vest, an employee is guaranteed a premium waiver for as long as qualification for disability or rehabilitation status continues -- the plan sponsor may not unilaterally alter vested benefits. Second, plaintiffs contend that even if the right to health care premiums did not vest when an employee qualified for long-term disability, the LTD Plan guaranteed that benefits would vest for all those on long-term disability at the time the LTD Plan was terminated. Plaintiffs assert the LTD Plan terminated at the time Control Data/Ceridian sold Imprimis to Seagate. Finally, even assuming the right to have health care premiums paid did not vest, plaintiffs submit that a question of material fact exists over whether it became "necessary" for Ceridian to eliminate the benefit.

A.     **Did the health benefit premium payments vest once plaintiffs qualified for long-term disability?**

In regulating plans, ERISA distinguishes between two types of employment benefits, welfare benefits and pension benefits. 29 U.S.C. § 1002(1),(2). The LTD Plan is an employee welfare benefit plan because disability insurance plans are considered welfare, not pension, benefits. <u>See</u> <u>Williams v. Plumbers & Steamfitters Local 60</u>, 48 F.3d 923, 925 (5th Cir. 1995). Vested benefits are those which are nonforfeitable.

Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 376 (1980). Benefits provided under a welfare benefit plan need never vest. Curtiss-Wright Corp. v. Schoonejongen, 115 S. Ct. 1223, 1228 (1995); Pitman v. Blue Cross and Blue Shield, 24 F.3d 118, 121 (10th Cir. 1994). Congress intentionally exempted welfare benefit plans from ERISA vesting requirements, determining that "[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1160 (3d Cir. 1990) (citing H.R. Rep. No. 807, 93rd Cong., 2d Sess. 60).

An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits. Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir. 1992); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir. 1990), cert. denied, 498 U.S. 1026 (1991). A plan sponsor who changes the vested benefits granted in a welfare plan may be liable to a beneficiary under the plan. 29 U.S.C. § 1132(a)(1),(3); see also, e.g., Wheeler v. Dynamic Eng'g Inc., 62 F.3d 634, 639-40 (4th Cir. 1995). Plaintiffs argue that the LTD Plan SPD constitutes an enforceable promise to pay the disabled employees' health care premiums as long as they remain in a disabled condition. The employees, as beneficiaries of the plan, are entitled to enforce and clarify their present and future rights under the plan. 29 U.S.C. § 1132(a)(1)(B).

Because an employee benefit plan must be established by a "written instrument," 29 U.S.C. § 1102(a)(1), a promise to provide vested benefits "must be incorporated, in some fashion, into the formal written ERISA plan." Jensen v. SIPCO, 38 F.3d 945, 949 (8th Cir. 1994) (quotation omitted), cert. denied, 115 S. Ct. 1428 (1995). SPDs are considered part of the ERISA plan documents. 29 U.S.C. § 1022(a)(1); Alday, 906 F.2d at 665. In interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law. Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 288-89 (3d Cir. 1995), cert. denied, 116 S. Ct. 1826 (1996). In this case we apply the de novo standard of review to interpret the terms of a plan, Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), "giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean," Blair v. Metropolitan Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992) (quoting McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1202 (10th Cir. 1992)) (emphasis omitted). Defendants assert, and the district court below found, that because the LTD Plan and the SPD explicitly reserve the right to change or discontinue the plan, any promise to continue benefits was subject to the rights reserved. Plaintiffs contend that the SPD's explicit promise that the company would pay the premiums on company-sponsored benefits as long as the employee is disabled is inconsistent with the reservation of rights, creating an ambiguity for which summary judgment is inappropriate.

As a threshold matter, we address plaintiffs' argument that all four of the benefit plan documents really constitute one ERISA plan, and that we must look to promises made in the Control Data Health Care Plan to interpret the rights of participants in the LTD Plan. Plaintiffs provide no circuit authority for the proposition that these four separate plans should be treated as one, arguing only that we should adopt the interpretive practice that when several contracts refer to the same matter they should be construed together. See FDIC v. Hennessee, 966 F.2d 534, 537 (10th Cir. 1992) (applying Oklahoma law). We conclude that Control Data intended to create separate plans. Each has a different ERISA identification number; the plans do not all share the same administrator or trust; and, most importantly, it is clear from the language of the plan documents that the company intended to establish four different plans. We decline plaintiffs' invitation to read the documents of the four separate plans as one for the purposes of determining plaintiffs' benefits in the LTD Plan. Nevertheless, where appropriate, we do refer to each of the relevant plans to determine Control Data's intent.

Because welfare benefits do not statutorily vest under the terms of ERISA, plaintiffs carry the burden of showing an agreement or other demonstration of employer intent to have company-paid premiums vest under the plan. Houghton v. SIPCO, Inc., 38 F.3d 953, 957 (8th Cir. 1994). The conflict between a plan sponsor's reservation of the right to change or discontinue a plan, appearing in the same document as a promise of interminable benefits to qualifying participants, presents difficult issues of interpretation.

This case presents the question of whether health benefits vest in the face of a reserved modification clause once the employee qualifies for disability status. A number of courts have addressed similar cases, where a reservation clause appeared within the same document as a promise of lifetime welfare benefits continuing after employees reach retirement. See, e.g., In re Unisys Corp. ERISA Litig., 58 F.3d 896 (3d Cir. 1995); Jensen, 38 F.3d 945; Gable v. Sweetheart Cup Co., 35 F.3d 851 (4th Cir. 1994), cert. denied, 115 S. Ct. 1442 (1995); Howe, 896 F.2d 1107.

Boiled down to its essence, the question is not whether an ERISA plan document containing apparently conflicting provisions is ambiguous in toto. Rather, it is whether the reservation of rights clause itself, read in tandem with the promise of continuing benefits to participants who maintain a particular status, is ambiguous with respect to the rights of the participants who have attained the status if the reservation does not specifically address alteration or termination of their benefits. In most cases, the issue involves retirees who are promised continued health care coverage for life; here, the plan allegedly promises continued health insurance to participants on disability. In either situation, plaintiffs have voluntarily or involuntarily reached the status for which the plan promises continued benefits. Recent cases from other circuits are not uniform in determining whether a general reservation of rights clause unambiguously controls a separate promise of benefits upon retirement. In Unisys, the Third Circuit concluded that a general reservation of rights clause unambiguously controls a promise of continued

- 11 -

health care benefits to retirees: "[a]n employer who promises lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed the plan participants of the time period during which they will be eligible to receive benefits provided the plan continues to exist." 58 F.3d at 904. In Jensen, the Eighth Circuit found two general reservation of rights clauses to be "not facially unambiguous--they leave at least some doubt as to whether [the employer] intended to reserve the right to change or terminate benefits to already retired pensioners, or only the right to make prospective changes for those covered by the Plan but not yet retired." 38 F.3d at 950.[2]

Whether an employer intends to commit contractually to an open-ended obligation where the ERISA document is silent presents a difficult question, susceptible to a number of interpretive approaches. See Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir.) (en banc) (thoroughly discussing possible approaches to this interpretive conundrum), cert. denied, 114 S. Ct. 291 (1993). In this case, however, we need not choose between a hard-and-fast rule finding a general reservation of rights clause unambiguously

---

[2] We recognize that the weight of case authority supports the Unisys approach, that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits. See, e.g., Gable, 35 F.3d 85; Alday 906 F.2d 660; Howe, 896 F.2d 1107. But see Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937-38 (5th Cir.) (limiting its holding to allow employer to change retirement benefits with respect to not yet retired workers; emphasizing that retroactive changes to the rights of already retired workers was not an issue before the court), cert. denied, 114 S. Ct. 196 (1993).

controlling any promise located in another part of an ERISA document, and an approach finding ambiguity unless the plan document spells out exactly whose benefits may be unilaterally altered. In this case, it is clear that Control Data retained the right to change the benefits of all LTD plan participants--including those who had already qualified for long-term disability.

As noted above, the LTD plan's reservation of rights clause contains a proviso. Described in the plan's SPD, it states: "If the group Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claim for such benefits will continue as long as you remain totally disabled as defined by the plan." Here, the LTD plan specifically contemplates a situation in which Control Data's discretion to change the plan is circumscribed. We find that the interpretive maxim of *expressio unius est exclusio alterius* -- the expression of one thing is the exclusion of another -- properly applies to this case. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (using *expressio unius* maxim as an ERISA interpretive device to determine parties' intent in a severance agreement). By explicitly listing a qualification to Control Data's ability to change the LTD plan, it is proper to infer that the right to make other changes to disabled participants' benefits was reserved. While the maxim of *expressio unius* is not dispositive, it does carry weight. Id. Supporting this interpretation is language in the LTD master plan stating that all "participants" are bound by amendments;

- 13 -

under the same section, disabled employees are considered "participants." Aplt. App. 495-96. Our conclusion makes particular sense in this case, where plaintiffs' reading of the plan would render the termination exception superfluous; under plaintiffs' interpretation, Control Data may not alter the benefits of disabled participants under any condition, regardless of whether the plan terminates.

Plaintiffs suggest that the termination proviso itself vests the benefits of the plan in an employee once he becomes disabled, because the right to benefits cannot be withdrawn by terminating the plan. Contractual vesting of a welfare benefit is an extra-ERISA commitment that "must be stated in clear and express language." Wise, 986 F.2d at 937. The plain reading of this provision clearly pinpoints plan termination, not employee disability, as the vesting trigger. Contractual vesting is a narrow doctrine. Id. at 938. We are unwilling to hold that the vesting of benefits upon the occurrence of a specific expressed condition (termination) can be read broadly to include vesting generally upon an unexpressed condition (attaining disability). See Restatement (Second) of Contracts § 203(c) ("specific and exact terms are given greater weight than general language"). A reasonable person in the position of an LTD Plan participant could read the termination provision in the SPD only as allowing Control Data to modify or terminate the plan when it deems necessary, but if the plan terminates certain benefits may not be withdrawn.[3]

---

[3] Similarly, we cannot find that the Control Data Health Care Plan creates an unforfeitable, vested right. While the Health Care Plan does state that a plan participant on approved disability will have continued coverage at no cost, this benefit appears

- 14 -

Plaintiffs attempt to distinguish the reservation of rights clause in the case at bar from those in which amendment and termination controlled the promise of vested rights. We agree with the district court that the termination clause retained almost unlimited discretion in Control Data to change the plan. See Musto v. American Gen. Corp., 861 F.2d 897, 904 (6th Cir. 1988) (finding that termination clause controlled a promise of continued benefits, stating that "the company fully intends to continue the plan indefinitely and to meet any foreseeable situations that may occur. However, the company does, as it always has, reserve the right to change the plan and, if necessary, discontinue it."), cert. denied, 490 U.S. 1020 (1989). The term "if necessary," found in the SPDs of all four Control Data plans, is not conditioned on any event or circumstance. Thus its meaning cannot fairly imply, as plaintiffs suggest, that the plans can only be amended if necessary to their fiscal survival. See id. at 906 n.5. In this manner, the reservation of the right to amend in Control Data's plans differs from that in Alexander v. Primerica Holdings, Inc., 967 F.2d 90 (3d Cir. 1992), a case relied on by plaintiffs. There, the right to amend was ambiguous in its scope because the company only

_____

contingent on the continued existence of the disability plan. See Aplt. App. 189. Moreover, the Health Care Plan contains a conflicting provision suggesting that disability coverage does not extend indefinitely: "When coverage would otherwise end, benefits may continue if you are or a covered dependent is totally disabled. The plan will pay benefits for expenses related to that disability alone and only for 12 months following the month in which your coverage ended." Aplt. App. 191 (Health Care Plan SPD). Given the contingent and ambiguous nature of the Health Care Plan promise of disability benefits and the reservation of the right to change or discontinue the plan, we see no intent to vest an open-ended benefit.

- 15 -

"necessarily reserve[d] the right to amend, modify, or discontinue the Plan in conformity with applicable legislation and also subject to any applicable collective bargaining agreement." Id. at 93. This clause could reasonably be read to limit plan modifications to those necessary to comply with changes in the law. Id. at 92-93.[4] The term, "if necessary," in the Control Data plan SPDs cannot be read to limit the reserved right in any significant manner.[5]

The interpretive principles suggested by the plaintiffs do not fit circumstances such as these, where the employer has expressly reserved the right to amend the plan. The "Yard-Man inference" that "retiree benefits are in a sense `status benefits' which . . . carry with them an inference that they will continue so long as the prerequisite status is maintained," International Union UAW of America v. Yard-Man, Inc., 716 F.2d 1476, 1482 (6th Cir. 1983), cert. denied, 465 U.S. 1007 (1984), is an interpretive aid that applies once the provisions of the plan are determined ambiguous. See id. at 1480. Moreover, Yard-Man emphasized that the context in which benefits are written is important in making the inference; such an inference is more appropriate in the collective bargaining

_____

[4] Alexander itself distinguished the SPD language in Musto containing "if it becomes necessary" as a predicate to changing the plan, finding that such a term was unambiguous with reference to the actual plan itself and later SPDs allowing the company to "reserve the right to change the Plan and, if necessary, discontinue it." 967 F.2d at 95 (quoting Musto, 861 F.2d at 904). By contrast, the SPD in Alexander constituted the entire plan description.

[5] The district court found, alternatively, that even if Control Data/Ceridian could not change its plans without a showing of necessity, it satisfied this requirement in its letter explaining the change in benefits. We agree.

- 16 -

context where parties bargained over the language of retirement benefits. See id. at 1482; see also Armistead v. Vernitron Corp., 944 F.2d 1287, 1295-96 (6th Cir. 1991). In any event, the plan in Yard-Man contained no reservation of rights clause. Likewise, Hansen v. Continental Ins. Co. 940 F.2d 971, 982 (5th Cir. 1991), cited by plaintiffs for the proposition that language in a contract is resolved against the drafter, only applies once the court determines the plan or SPD contains ambiguities. Id. In fact, of the cases cited by plaintiffs in which the court found the language of benefits in the plan to be ambiguous, none contained language in which the employer unequivocally reserved the right to modify the plan.

We conclude that the Control Data/Ceridian plans are not ambiguous with respect to the employer's right to modify LTD benefits so long as the LTD Plan remained in operation. Company-paid health benefit premium payments did not vest upon plaintiffs' qualification for long-term disability.[6]

---

[6] In Barker, the case filed by Control Data/Ceridian employees in the District of Minnesota, the district court granted Ceridian summary judgment on plaintiffs' claim that the right to free health insurance vested upon qualifying for long term disability benefits, finding alternatively that the reservation of rights language unambiguously defeats any suggestion that the benefits are vested and, even if the intent to vest such benefits was ambiguous, extrinsic evidence favored Ceridian's right to change all aspects of its welfare plans. 918 F. Supp. at 1304-05. Although we reach the same conclusion on this issue as the Minnesota district court, we do not share in its implication that the reserved termination and amendment clauses themselves automatically defeat an intent to vest welfare benefits.

## B.     Did Rights to benefits vest because of LTD Plan Termination?

Plaintiffs contend that even if their right to employer-paid health benefits did not contractually vest at the time they qualified for disability, the LTD Plan terminated upon the sale of the Imprimis division to Seagate, and their "benefits" unambiguously vested at that point.  Under plaintiffs' interpretation of the LTD Plan's SPD, these benefits include a health care premium waiver.  Defendants challenged the plaintiffs' interpretation of the term "benefits."   They argued that the term only includes salary replacement benefits, and also alleged that the  LTD Plan never terminated.  The district court did not decide whether the plan terminated, because it found that the vested "benefits" provided upon termination of the LTD Plan include only the 60% salary replacement benefit.[7]

As discussed above, Control Data reserved the right to terminate the LTD Plan subject to the termination exception.  The district court below found that the "termination clause constitutes an unambiguous promise on the part of the defendant companies to continue long-term disability benefits to employees who have achieved long-term disability status in the event of termination of the plan . . ." Dt. Ct. Order at 16.  We agree.  The termination proviso exhibits the "clear and express language" necessary to vest an extra-ERISA commitment.  Gable, 35 F.3d at  855 (quoting Wise, 986 F.2d at

---

[7] In a footnote, the district court suggested that "it would appear that the Disability Income Protection Plan at issue in the case at bar did not terminate as urged by the Plaintiffs." Dt. Ct. Order, at 18-19, n. 10.  Instead, "[a]ny changes to the Ceridian plan should properly be considered a `modification' under ERISA law, 29 U.S.C. § 1022(a)(1), rather than a termination as urged by the Plaintiffs." Id.

- 18 -

937).  The parties disagree both on whether the Control Data LTD Plan terminated with respect to the Imprimis division employees, and what is intended by the term "long-term disability benefits."

Questions involving the scope of benefits provided by a plan to its participants must be answered initially by the plan documents, applying the principles of contract interpretation.  See Howe, 896 F.2d at 1109.  The law of trusts is also a valuable guide in interpreting ERISA documents.  Jensen, 38 F.3d at 950; Blair, 974 F.2d at 1222.  "The terms of trusts created by written instruments are determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."  Jensen, at 950 (quoting Bruch, 489 U.S. at 112 (1989)) (internal quotation omitted).  An SPD is considered part of the plan documents required by ERISA.  Jensen, 38 F.3d at 949.  If the clause to be construed does not itself determine the plan sponsor's intent, we read the language of the SPD as a whole.  Id. at 950.  Because the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself.  Hansen at 982.  When conflicting extrinsic evidence must be evaluated in order to illuminate a plan's terms, summary judgment is not appropriate.  Bower v. Bunker Hill Co., 725 F.2d 1221, 1225 (9th Cir. 1984).

### 1. Did the LTD Plan "Terminate"?

The LTD Plan summary is not ambiguous in requiring that the LTD Plan terminate before any benefits vest in plaintiffs. Even assuming health premium payment benefits could vest for disabled employees in the LTD Plan, if the plan did not "terminate," defendants are free to modify its terms. Plaintiffs argue that the LTD Plan terminated with respect to them when the Imprimis division was sold to Seagate and the latter assumed identical obligations to the plan participants.[8] Defendants characterize the change as a "modification" under 29 U.S.C § 1022(a)(2), (b), which sets out an SPD's notification requirements in cases of "material modification." We conclude that the Control Data/Ceridian LTD Plan terminated with respect to plaintiffs upon the sale of the Imprimis division.

As part of the sale of the Imprimis division, the parties agreed that Seagate would become responsible for the payment of long-term disability benefits under the Control Data LTD Plan, and that Control Data's liability would terminate, except for payments of premiums on behalf of LTD participants on disability. Pursuant to this agreement, Control Data transferred funds to Seagate "in an amount equal to the present value of the projected disability benefits determined as of the closing date payable with respect to Imprimis Employees listed on Attachment." Thereafter, Seagate established the "Seagate

---

[8] The parties have stipulated that Control Data/Ceridian's LTD Plan continued in effect after the sale of Imprimis with respect to employees in its other divisions.

Technology, Inc. Long Term Disability Plan" for Imprimis employees "previously covered by the Control Data Corporation Long Term Disability Plan." The Control Data LTD Plan specifically states that "the Plan shall terminate as to a particular Employer upon the giving of notice by such Employer to the Trustee, executed in the manner of an amendment." The plan also provides: "Upon termination of the Plan, the Trustee shall continue to hold the Trust Assets and make distribution thereof at the times and in the manner heretofore provided, until the Trust Assets are depleted thereby."

ERISA provides strict obligations and procedures regarding termination of pension plans, 29 U.S.C. §§ 1103(d)(1), 1341, 1342, but provides no guidelines to determine when a plan terminates. See In re Syntex Fabrics, Inc. Pension Plan, 698 F.2d 199, 203 (3d Cir. 1983) (suggesting that a plan terminates "when the employer's obligation to fund the plan ceases, [and] employees can no longer accrue benefits"). The Syntex factors are grounded in the essential purposes of ERISA: to prevent an employee from losing accrued, vested benefits in the event the employer terminated the pension plan. Nachman, 446 U.S. at 374-75. With respect to termination of a welfare plan, ERISA only requires that "[t]he assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan, except as otherwise provided in the regulations of the Secretary." 29 U.S.C. § 1103(d)(2). Because ERISA welfare plans do not need to vest or be funded, the rules underlying terminating a pension benefit plan have little application. Unfortunately, there is a scarcity of guidance on questions of welfare plan

termination. The two cases cited by plaintiffs for partial plan terminations both involve pension plan obligations, where in order to maintain a tax qualified plan, termination triggers specific ERISA obligations regarding accrued benefits. See Gluck v. Unisys Corp., 960 F.2d 1168 (3d Cir. 1992); Kreis v. Charles O. Townley, M.D. & Assoc., P.C., 833 F.2d 74 (6th Cir. 1987).[9] Partial terminations, determined for the tax aspects of ERISA plans, do not automatically determine partial terminations for ERISA purposes. Chait v. Bernstein, 835 F.2d 1017, 1020 (3d Cir. 1987).

Although it is unclear whether the trustee of the Control Data LTD Plan was properly notified that the plan was terminating, the facts that new trustees were appointed to a replacement plan instituted by Seagate, that Seagate became the administrator of the new plan, that Control Data transferred money to fund the new plan, and that after the transfer Seagate assumed all of Control Data's obligations with respect to disability plan participants, together suggest that the Control Data LTD Plan terminated.[10] See In re

---

[9] The Internal Revenue Code requires, in the case of qualified pension plan trusts created pursuant to §401(a), that employees become vested to the extent the plan is funded in the event of a partial termination. 26 U.S.C. §§ 401, 411(d)(3). Whether a plan is partially terminated is determined with regard to all the facts and circumstances of the particular case. 26 C.F.R. § 1.411(d)-2(b)(1); Borst v. Chevron Corp., 36 F.3d 1308, 1313 & n.9 (5th Cir. 1994), cert. denied, 115 S. Ct. 1699 (1995). The trust for the LTD Plan was established under section 501(c)(9) of the Code. 26 U.S.C. § 501(c)(9).

[10] Defendants, without citing case authority, contend that the sale of Imprimis and change in administrators merely constituted a "material modification" of the plan as defined by 29 U.S.C. § 1022(a)(1), which includes as modifications fundamental changes in the plan. Aplee. Br. at 39-40. While the changes described in § 1022(a) could be treated as modifications, that does not preclude the very real possibility that they could also constitute a termination. Cf. Curtiss-Wright, 18 F.3d at 1041 (requiring a proposed

Syntex Fabrics, 698 F.2d at 203; see also Myron v. Trust Co. Bank Long Term Disability Benefit Plan, 522 F. Supp. 511, 516 (N.D. Ga. 1981) (disability plan terminated when plan funding was changed from one insurance company to another), aff'd, 691 F.2d 510 (11th Cir. 1982), cert. denied, 462 U.S. 1119 (1983). Essential features of an ERISA plan include a procedure for establishing and carrying out a funding policy for the plan and procedures for the operation and administration of the plan. 29 U.S.C. § 1102(b). After the sale of Imprimis none of these provisions remained of the Control Data LTD Plan as far as plaintiffs were concerned; the responsibilities for funding and administering plaintiffs' disability benefits shifted to the Seagate LTD Plan. Given the facts of this case, the Control Data LTD Plan terminated with respect to Imprimis division employees when Control Data was released from its obligation to fund the plan with respect to those employees and the employees could look to the Seagate LTD Plan for benefits.[11]

_____

termination to comply with the notice of modification requirements in § 1024(b)(1) and § 1022(a)(1)).

[11] The Control Data LTD Plan master document declares that the plan terminates with respect to a participant on the date he or she ceases to be an employee of Control Data or one of its wholly-owned subsidiaries. (LTD Plan at §§ 2.01, 2.02, 3.03(A)) This language also suggests to us that once the Imprimis division was sold its employees' participation in the Control Data Plan was terminated.

### 2. Do "benefits" include company-paid health premiums?

Defendants contend that the ERISA documents cannot support a reading of the term "benefits" to include payment of health care premiums. We begin our inquiry with the LTD Plan's SPD itself. It is impossible solely from the language of the SPD's termination provision to determine what benefits the phrase "Long Term Benefits and your claim for such benefits" includes. Elsewhere the SPD uses the term "Long-Term Disability benefit" and "Long-Term Disability Plan benefits" to describe what eligible employees are entitled to. The document does not expressly define either term, or distinguish between the two. See Aplt. App. 505-06. Plaintiffs point to several parts of the SPD to suggest that "Long Term Benefits" includes payment of the health insurance premiums. First, they note that the termination clause refers to "benefits" in the plural, while the definition section of the SPD refers to the compensation replacement component of the LTD Plan in the singular. ("**Basic monthly compensation**: If you become disabled, the benefit you receive from the plan is calculated using your basic monthly compensation . . ." Aplt. App. 506 (emphasis added). In other parts of the SPD, the term "benefit" and "benefits" are both used to describe what the LTD Plan provides. Second, the SPD refers to the premium payments several times as benefits that are part of long term disability status. Page 7 of the SPD states: "Status: While on Long-Term Disability Status the company will pay the premiums for all the company-sponsored

- 24 -

benefits . . . for which you and your dependents were enrolled before your disability began." Aplt. App. 510. Again on page 11:

> Rehabilitation benefits are calculated as follows: . . . 2) If you are receiving Long-Term Disability benefits when you return to work on Rehabilitation Status, your rehabilitation benefit will be equal to 60 percent of you wage loss . . . . This benefit is not taxed. The company will continue to pay premiums on company sponsored benefits . . . .

Aplt. App. 514. On page 14, the SPD provides a chart entitled "Continuation of other Benefits and Programs During Disability." In this chart, it is clear that the company pays the health care premium for employees who are "Disabled and on Short-Term or Long-Term Status."

Plaintiffs have made a prima facie case that a reasonable person in the position of an LTD Plan participant could find the language in the SPD to include payment of health insurance premiums as a benefit to which persons on "Long-Term Disability Status" are entitled. "Long-Term Disability Status" is achieved after an employee's "fifth consecutive month of disability." Aplt. App. 509. The promise of continuing benefits in the termination clause applies to persons who are "totally disabled," a term that likewise is not defined. The term "Long-Term Disability benefits," as used in the termination clause, is susceptible to the reading given it by plaintiffs, that the termination clause can be read to vest health benefits. See Carland v. Metropolitan Life Ins. Co., 935 F.2d 1114, 1120 (10th Cir.), cert. denied, 502 U.S. 1020 (1991).

- 25 -

Defendants argue that when looking at the plan documents as a whole, the language regarding the extent of benefits at termination is unambiguous. Beginning with the SPD they note that the purpose of the LTD Plan is to "protect disabled employees from loss of income and to help them return to productive work whenever possible." Aplt. App. 504. From this the defendants conclude that the LTD Plan's SPD must be read to insure only against income loss created by disability. Defendants fail to recognize that requiring disabled employees to pay their health care premiums out of the 60% salary replacement benefit exacerbates their income loss. This language does not resolve the apparent ambiguity.

Next, defendants explain the apparent ambiguity of using both "benefit" and "benefits" to describe the income replacement provision of the LTD Plan by suggesting that when used in the singular, the SPD is referring to a single periodic payment of the income replacement, while when used in the plural it refers to multiple payments. The language of the SPD section on payment of the salary replacement benefit could be read consistently with defendants' interpretation. Nevertheless, we cannot say that this explanation removes the ambiguity. An SPD is intended to be a document easily interpreted by a layman; an employee should not be required to adopt the skills of a lawyer and parse specific undefined words throughout the entire document to determine whether they are consistently used in the same context. See McKnight v. Southern Life & Health Ins. Co., 758 F.2d 1566, 1570 (5th Cir. 1985) (the purpose of an SPD is to

simplify and explain the complex document that makes up the plan).  An employee

reading the SPD and believing that upon the termination of the LTD Plan she would be

entitled to continued company-paid premiums for health insurance, is not engaging in an

"unrealistically narrow" interpretation of the document.  Wise, 986 F.2d at 939 (quoting

Sharron v. Amalgamated Ins. Agency Serv., Inc., 704 F.2d 562, 566 (11th Cir. 1983)).

Plaintiffs' reading of the promised benefits in the SPD's is not rebutted by defendants'

reference to the SPD as a whole.

Defendants next shift to the LTD master plan document itself.  Noting that it does

not include health premium payments as benefits within the plan, they argue that only the

Control Data/Ceridian Health Care Plan provides these benefits to disabled employees.

Because the LTD Plan's termination clause has no vesting effect on benefits granted

under the health care plan, defendants maintain the LTD Plan benefits are unambiguously

limited to income replacement.  Defendants submit that by reviewing the LTD Plan's

language, any ambiguity in the SPD is resolved.  The issue then narrows to whether the

ambiguity of plan benefits  in the plan SPD can be resolved against participants by

looking to the plan master documents.

While Control Data/Ceridian may have intended to coordinate the benefits in its

various plans in such a manner that LTD Plan participants were entitled only to income

replacement benefits upon the termination of the plan, it was obligated by the SPD to

inform its employees of such intent.  29 U.S.C. § 1022(a)(1); see also 29 C.F.R. §

- 27 -

2520.102-3(j)(2), (l) (a welfare benefit plan's SPD shall include a description or summary of benefits and a statement "clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required").  The LTD Plan SPD nowhere states that health care benefits provided to those on disability come from the health care plan, not from the LTD Plan.  In fact, the LTD Plan SPD purports to summarize the LTD program, not the Health Care program.

Because the SPD is such an important vehicle in ERISA's attempt to fairly regulate employment benefits, courts have held that the terms of the master plan cannot control an SPD's provision that is ambiguous or in conflict with the master plan document.  Pierce v. Security Trust Life Ins. Co., 979 F.2d 23, 27 (4th Cir. 1992); Hansen, 940 F.2d at 981-82; Heidgerd v. Olin Corp., 906 F.2d 903, 907 (2d Cir. 1990); Edwards v. State Farm Mut. Auto Ins. Co., 851 F.2d 134, 136 (6th Cir. 1988); McKnight, 758 F.2d at 1570-71.  The duty of clarity falls upon the plan sponsor. As the Fifth Circuit cogently reasoned in Hansen:

> Any burden of uncertainty created by careless or inaccurate drafting of the
> summary must be placed on those who do the drafting, and who are most
> able to bear that burden, and not on the individual employee, who is
> powerless to affect the drafting of the summary or the policy and ill
> equipped to bear the financial hardship that might result from a misleading
> or confusing document.  Accuracy is not a lot to ask.  And it is especially
> not  a lot to ask in return for the protection afforded by ERISA's preemption

> of state law causes of action--causes of action which threaten considerably
> greater liability than that allowed by ERISA.

Hansen, 940 F.2d at 982. Allowing the plan's master documents to trump the SPD would both undermine Congress's intent for the SPD to convey accurately plan information to employees upon which they could rely, see 29 U.S.C. § 1022(a)(1), and would tempt plan sponsors to engage in drafting legerdemain in order to conceal or omit the less attractive aspects of their plan, thereby creating for ERISA a Daliesque world of legal surrealism. See James F. Stratman, Contract Disclaimers in ERISA Summary Plan Documents: A Deceptive Practice?, 10 Indus. Rel. L.J. 350 (1988) (documenting how employees reading SPDs can be misled as to their contractual rights). Based on the evidence in the record it is unclear what benefits plaintiffs were entitled upon plan termination. Whether we conclude that the ambiguous SPD renders the LTD Plan documents faulty, or that it is unclear from the plan documents what benefits the plan confers, summary judgment is inappropriate.

The mere demonstration that the SPD is inconsistent with the terms outlined in the LTD Plan itself does not entitle plaintiffs to the benefits they believe vested upon termination. Where the SPD incorrectly described benefits in the plan, "'to secure relief, [the claimant] must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description.'" Aiken v. Policy Management Sys. Corp., 13 F.3d 138, 140 (4th Cir. 1993) (quoting Govoni v. Bricklayers Int'l Union Local No. 5 Pension Fund, 732 F.2d 250, 252 (1st Cir. 1984)); accord Gable, 35 F.3d at 859; Gridley v. Cleveland

Pneumatic Co., 924 F.2d 1310, 1319 n.8 (3d Cir.) cert. denied, 501 U.S. 1232 (1991); Bachelder v. Communications Satellite Corp., 837 F.2d 519, 522-23 (1st Cir. 1988). This requirement makes sense because the purpose of the SPD is to give employees an understanding of the plan upon which they are entitled to rely; the master plan document, however, is also relevant to determine what the terms of the plan actually are. Only where employees rely on an ambiguous or faulty SPD, or otherwise show prejudice from the inconsistency between the SPD and the master plan document, is relief appropriate. Any other rule would allow a windfall for some employees and unfairly increase costs for employers and their insurers, who rely on the terms of the plan in providing benefits and coverage. This in turn could jeopardize the solvency of the plan with respect to the remaining employees. Because we conclude that summary judgment is inappropriate regarding the scope of "benefits" vested upon plan termination, we leave it to the district court to determine the issue of reliance.

On remand, plaintiffs may attempt to demonstrate that the LTD Plan did in fact include health benefit premiums as part of disability benefits.[12] Alternatively, if plaintiffs' evidence only shows that the LTD Plan SPD could lead an employee to reasonably believe that the Plan intended health benefits to vest, each individual plaintiff

---

[12] In interpreting this ambiguous provision in the plan the district court may consider interpretive statements made by Control Data, past practices, customary usage in the trade, and other competent evidence bearing on the understanding of the parties. Taylor v. Continental Group, 933 F.2d 1227, 1233 (3d Cir. 1991).

must demonstrate some reasonable reliance on the SPD provision or prejudice flowing from the inconsistency between the SPD and the Plan master document. The issue of detrimental reliance on the plan document is not appropriate for class action determination. See Jensen, 38 F.3d at 953.[13] Of course, if plaintiffs prove that the LTD Plan in fact intended to vest a continuing health care premium waiver, no reliance need be shown.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment that health care premium benefits did not vest when plaintiffs became disabled. We REVERSE the remainder of the judgment, and REMAND to the district court for proceedings consistent with this opinion.

---

[13] We stress that this case does not involve principles of federal common law estoppel to modify unambiguous written plan documents. See Miller v. Coastal Corp., 978 F.2d 622 (10th Cir. 1992) (informal communications to employees do not modify unambiguous contradictory terms in written plan documents), cert. denied, 507 U.S. 987 (1993); Straub v. Western Union Tel. Co., 851 F.2d 1262, 1265 (10th Cir. 1988) (terms of benefit plan cannot be modified through promissory estoppel by oral representations).