United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-2429

_____

Kent P. Barker; Carla J.                    *
McAndrews;                                  *
Martin J. Timmons, on behalf of             *
themselves and all others                   *
similarly                                   *
situated,                                   *
                                            *  Appeal from the United States
                          Plaintiffs -      *  District Court for the
Appellants,                                 *  District of Minnesota.
                                            *
                                            *
                                            *
        v.                                  *
                                            *
Ceridian Corporation, a Delaware            *
corporation, individually and as            *
successor in interest to Control            *
Data Corporation,                           *

                          Defendant -
Appellee.

_____

Submitted: February 13, 1997
                    Filed: August 26, 1997

_____

Before McMILLIAN, JOHN R. GIBSON, and FAGG, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

        Appellants, a certified class of disabled employees who receive
disability benefits under a long-term disability plan, appeal the district
court's grant of summary

judgment for their employer, Ceridian Corporation, that allowed Ceridian to stop paying the employees' health, dental, and life insurance premiums. The employees bring their claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (1994). They argue that the district court's grant of summary judgment was erroneous because Ceridian provided vested disability benefits and did not unambiguously reserve the right to retroactively change the level of disability benefits that employees would receive in the future. They further argue that the extrinsic evidence they submitted created a genuine issue of material fact concerning Ceridian's right to change disability benefits retroactively. Because the long-term disability plan does not unambiguously reserve to Ceridian the right to change the disability benefits retroactively, a genuine issue of material fact exists. Accordingly, we reverse the district court's judgment and remand for additional discovery and a trial.

Appellants Kent P. Barker, Carla J. McAndrews, and Martin J. Timmons represent a class of disabled employees of Ceridian Corporation. The class includes all employees of Ceridian, formerly known as Control Data Corporation,[1] who were disabled before January 1, 1991 for whom Ceridian paid health, life, and dental insurance premiums on or before December 31, 1993.[2] Until December 31, 1993, Ceridian paid each class member's premiums for the life, health, and dental insurance in which they were enrolled at the time they became disabled. Ceridian also paid the disabled employees 60% of their pre-disability wage. Beginning January 1, 1994, Ceridian stopped paying the premiums and required the employees to pay their own premiums to continue their insurance coverage.

---

[1]Ceridian is the successor-in-interest to Control Data Corporation. Therefore, we will refer to the appellee as Ceridian.

[2]The class specifically excluded those individuals who were members of the class in Chiles v. Ceridian Corporation, Inc., a suit filed in the United States District Court for the Western District of Oklahoma. An opinion regarding this class action is recorded at 95 F.3d 1505 (10th Cir. 1996).

Appellants brought this action alleging that Ceridian's refusal to continue paying their insurance premiums violates ERISA. The parties' arguments revolve around the ERISA plans offered by Ceridian. Years ago, Ceridian adopted several benefit plans for its employees, including a health care plan, dental assistance plan, life insurance plan, and disability plan. Formal plan documents described each plan. In addition, as required by ERISA, 29 U.S.C. § 1022 (1994), Ceridian provided its employees with a summary plan description for each plan that described the various benefits offered by the plans and claim procedures. For several years the company issued summary plan descriptions to employees in separate booklets for each type of benefit, but starting in 1989 Ceridian combined the summary plan descriptions for all of the various plans into a single benefits manual.

Before 1989 the Disability Income Protection summary plan descriptions summarized three disability plans: sick leave, short-term disability, and long-term disability. Under the long-term disability plans, disabled employees were eligible for long-term disability status beginning after their fifth consecutive month of disability. Employees who qualified under this plan were entitled to up to 60% of their pre-disability salary. The summary plan descriptions also provided: "While on Long-Term Disability Status the company will pay the premiums for all the company-sponsored benefits (medical, life, and dental) for which you and your dependents were enrolled before your disability began. The company will continue paying all premiums until you and your dependents are no longer eligible for the plans."[3] A chart in the summary plan descriptions reiterated Ceridian's promise to pay the disabled employees' insurance premiums. The formal document for the long-term disability plan, however, did not contain any reference to the terms, conditions, or descriptions of health, dental, or life

---

[3]The quoted language is from the 1986 Disability Income Protection summary plan description. The language of the 1983 summary plan description is slightly different, though substantively the same.

insurance benefits.  During the period before 1989 the individual plan documents for the dental, life, and health insurance plans also stated that Ceridian would pay the insurance premiums during the employee's disability.

The plans in effect before 1989 also contained provisions discussing plan amendment and termination.  The Disability Income Protection summary plan descriptions provided:  "Control Data expects to continue the Long-Term Disability Plan indefinitely, but must reserve the right to change or discontinue it if it becomes necessary.  This would be done only after careful consideration."  The amendment and termination language in the formal plan document differed slightly from the language in the summary plan descriptions.  The formal plan allowed plan amendments if deemed advisable by Ceridian and reserved Ceridian's right to terminate the plan at any time.

The Long-Term Disability Plan's reservation of rights provision included additional language relevant to this action.  Before 1989 the disability summary plan descriptions expressly provided: "If the group Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claim for such benefits will continue as long as you remain totally disabled as defined by the plan."  The formal long-term disability plan made the same promise.  This language was not found in the documents for the dental, health, or life insurance benefit plans.   Instead, the termination provision in the 1984 summary plan description of the dental and life insurance plan, and the 1983 summary plan description of the health care plan provided:  "If, while you or your dependents are covered under this plan, the plan terminates or the class of employees of which you are a member has its coverage terminated, then no benefits (including extended benefits) will be payable to you for any charges, fees, or expenses incurred on or after that date of termination of the policy or termination of the class."  The 1984 life insurance summary plan description included the same provision.

Effective January 1, 1989, Ceridian issued an employee benefits manual that combined the summary plan descriptions for its employee benefit plans. The disability section of the 1989 Benefits Manual repeated Ceridian's agreement to pay the health, life, and dental insurance premiums of disabled employees. However, the 1989 Benefits Manual contained a different reservation of rights provision: "While [Ceridian] plans to continue these plans and programs, it reserves the right to change or cancel them at any time." The manual made no mention of Ceridian's promise to continue paying disability benefits if Ceridian terminated the plan, as promised in previous Long-Term Disability summary plan descriptions. The formal Long-Term Disability Plan in effect at that time, however, continued to contain this agreement: "Notwithstanding termination of the Plan, a Participant who is Totally Disabled on the effective date of the Plan termination and is otherwise entitled to benefits hereunder, shall continue to receive benefits in accordance with the terms of the Plan."

In 1991, Ceridian issued a new employee benefits manual that stated that Ceridian would no longer pay the health, dental, and life insurance premiums for employees who became disabled on or after January 1, 1991. Ceridian told Barker, a class representative, that this change only applied to employees who became disabled on or after January 1, 1991. This change did not affect the benefits Ceridian paid to the class members, which included 60% of their pre-disability wage and 100% of their life, health, and dental insurance premiums.

In 1992, Ceridian changed its long-term disability plan again. Effective January 1, 1992, Ceridian allowed active, non-disabled employees to choose to pay a higher disability premium in return for an increase in their long-term disability income benefit to 70% of their pre-disability earnings. Ceridian again explained to Barker that this change only applied prospectively.

In the fall of 1993, Ceridian notified the disabled employees that it would stop paying 100% of their health, life, and dental insurance premiums beginning January 1,

1994.  The disabled employees then brought this action.  The district court held that the employees had no vested interest in company-paid premiums because the plan documents showed that Ceridian had no specific intent to be unconditionally bound in the future.  Further, the district court concluded that the termination and amendment clauses included in the plan documents defeated the employees' claim for vested insurance premium benefits.  Even if the language in the plans was ambiguous and could be interpreted as expression of an intent to provide vested company-paid premiums to disabled employees, the district court concluded that the only extrinsic evidence in the record reflected Ceridian's intent to reserve its right to change all aspects of the plan.  Accordingly, the district court granted summary judgment for Ceridian.

On appeal, the disabled employees argue that the district court's grant of summary judgment was erroneous because Ceridian provided vested disability benefits and did not unambiguously reserve the right to change the level of disability benefits retroactively.  The employees also contend that the extrinsic evidence they submitted creates a genuine issue of material fact concerning Ceridian's right to change disability benefits retroactively.  Ceridian argues that the plan documents did not provide a vested right to 100% payment of the insurance premiums and that Ceridian unambiguously reserved its right to change or terminate the welfare benefits paid to the disabled employees.

We review de novo a grant of summary judgment.  See McKee v. Federal Kemper Life Assurance Co., 927 F.2d 326, 328 (8th Cir. 1991).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  We construe the factual record and all reasonable inferences from the record in the light most favorable to the party opposing summary judgment.  See Schrader v. Royal Caribbean Cruise Line, Inc., 952 F.2d 1008, 1013 (8th Cir. 1991).  In interpreting the terms of this ERISA Plan, it is appropriate to apply

a de novo standard of review, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), "giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words." Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996) (quotations omitted).

**I.**

ERISA distinguishes between two kinds of employment benefits--welfare benefits and pension benefits. See 29 U.S.C. § 1002(1)-(2) (1994). The employees concede that the plans at issue before us are employee welfare benefit plans. Though pension plans are subject to mandatory vesting requirements, see 29 U.S.C. § 1053 (1994), welfare plans are not subject to such standards, and employers generally are free to amend or terminate these plans unilaterally. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995); Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994), cert. denied, 514 U.S. 1050 (1995). However, the simple fact that ERISA does not require vesting of welfare benefit plans does not mean that a welfare benefit plan will never vest. An employer and employee may contract for post-employment welfare benefits that vest. See In re White Farm Equip. Co., 788 F.2d 1186, 1193 (6th Cir. 1986).

ERISA requires that employee benefit plans be established by a written instrument. See 29 U.S.C. § 1102(a)(1). Therefore, any promise to provide vested benefits must be "incorporated, in some fashion, into the formal written ERISA plan." Jensen, 38 F.3d at 949 (quotation omitted). Summary plan descriptions are considered part of ERISA plan documents. See id. Adequate disclosure to employees is one of ERISA's major purposes. See id. at 952. Because of the importance of disclosure, in the event of a conflict between formal plan provisions and summary plan provisions, the summary plan description provisions prevail. See id.

When interpreting ERISA plan documents, we look to the law of trusts: "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissable.'"  Id. at 950 (quoting Bruch, 489 U.S. at 112).  In determining if other evidence is admissible we look to the language of the plan provision at issue and consider whether the provision is ambiguous:

> that intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings.  If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes. . . . [T]he third step becomes necessary when the intent or meaning of the settlor. . . . cannot be determined by reference to the provisions of the trust instrument itself.  Extrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.

Id. (quotation omitted).

## II.

As described above, the reservation of rights clauses in the long-term disability plans provided that if the plans terminated Ceridian would continue paying disability benefits to those totally disabled at the time of the plan termination.  This differed from the reservation of rights clauses in the health, dental, and life insurance plans, which simply provided that Ceridian might change or discontinue the plans if it became necessary.  Therefore, to determine which reservation of rights provisions apply to the disabled employees' claims, we must determine the source of Ceridian's promise to pay the insurance premiums.

The employees contend that the promise to pay the insurance premiums stems from the long-term disability plan itself. The 1983 and 1986 plans made several references to the health, dental, and life insurance premiums. For example, the plans provided that while an employee is on long-term disability status Ceridian will pay all the medical, life, and dental benefits for which the employee and dependents were enrolled before the disability began. The plans also provided a chart summarizing benefits available during disability. Each of these charts expressly provided that Ceridian would pay premiums for health, dental, and life insurance programs for employees on long-term disability status.

Ceridian points to the plan documents for the health, dental, and life insurance plans that discuss how the respective benefits will be handled during a period of disability. In light of this language, Ceridian argues that its liability for payment of insurance premiums comes from the separate insurance coverage plans. Ceridian contends the disability plan is simply for income protection, and does not in its own afford a right to the insurance premiums.

In considering the conflicting arguments, we reiterate that we apply a de novo standard of review to interpret the terms of a plan and give the plan's language the "common and ordinary meaning . . . a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words." See Chiles, 95 F.3d at 1511.

We hold that a reasonable person in the position of a plan participant would believe the language of the disability summary plan descriptions assured payment of the various insurance premiums. "A [summary plan description] is intended to be a document easily interpreted by a layman; an employee should not be required to adopt the skills of a lawyer and parse specific undefined words throughout the entire document to determine whether they are consistently used in the same context." Id. at 1517-18. The long-term disability summary plan descriptions repeatedly promise that

Ceridian will pay company-sponsored insurance premiums.  In 1989 only the long-term disability summary plan description contained the promise to pay the insurance premiums.  The individual life, health, and dental insurance plans did not promise that Ceridian would continue to pay insurance premiums for employees who become disabled.

Finally, in response to Ceridian's argument that the disability plan benefits only include income protection, in a real sense requiring disabled employees to pay their insurance premiums out of their 60% salary replacement benefit increases their income loss.  See Chiles, 95 F.3d at 1517.  Indeed, Ceridian's prospective plan amendment in 1992 that allowed disabled employees to receive 70%, rather than 60%, of their pre-disability earnings, may well have been intended to help compensate for Ceridian's 1991 plan change that required employees who became disabled after January 1, 1991 to pay part of their own insurance premiums.  A reasonable person in the position of a plan participant would conclude upon reading the plans that the long-term disability plan, and not the individual health, life, and dental insurance plans, provide payment of the insurance premiums.  Cf. id. at 1516-19 (not possible to determine from the language of the long-term disability plan what benefits the plan includes, and therefore issue is not appropriate for summary judgment).

## III.

Now that we have determined which plans control our analysis, we turn to the employees' argument that Ceridian's promise to pay insurance benefits until they were no longer disabled vested at the time the employees became disabled, and that Ceridian did not unambiguously reserve the right to change the level of disability benefits retroactively.  Because welfare benefits do not statutorily vest under ERISA, the employees carry the burden of showing an agreement or other demonstration of employer intent to vest benefits.  See Houghton v. SIPCO, Inc., 38 F.3d 953, 957 (8th Cir. 1994).

-10-

In support of their argument the employees cite <u>Local Union No. 150-A, United Food & Commercial Workers International Union v. Dubuque Packing Co</u>, 756 F.2d 66 (8th Cir. 1985). They argue that this case provides that benefits are vested when receipt of benefits depends on an employee's status. In <u>Dubuque Packing</u>, the court first looked at the language in the plan documents and determined that the language was ambiguous. After examining the extrinsic evidence, the court concluded that the plaintiffs had proved that the parties intended the benefits to vest when the parties retired. <u>Id.</u> at 70. <u>Dubuque Packing</u> thus stands for the proposition that parties can intend to provide vested benefits. We therefore look to see whether there was an intent to provide vested benefits in this case. Because welfare benefits do not automatically vest as a matter of law, the issue is "simply one of contract interpretation," <u>Anderson v. Alpha Portland Indus., Inc.</u>, 836 F.2d 1512, 1516 (8th Cir. 1988), <u>cert. denied</u>, 489 U.S. 1051 (1989), which is a question of law. <u>See</u> <u>Dubuque Packing</u>, 756 F.2d at 69. Where a contract is ambiguous, a court may weigh extrinsic evidence to assist in construing the language. <u>See</u> <u>id.</u>

The language of the 1986 disability income protection summary plan description provides: "While on Long-Term Disability Status the company will pay the premiums for all the company-sponsored benefits (medical, life, and dental) for which you and your defendants were enrolled before your disability began. The company will continue paying all premiums until you and your dependents are no longer eligible for the plans." The language of the 1983 summary plan description and the 1985 formal plan make the same promise. The 1983 and 1986 disability summary plan descriptions, however, state: "[Ceridian] expects to continue the Long-Term Disability Plan indefinitely, but must reserve the right to change or discontinue it if it becomes necessary. This would be done only after careful consideration." The 1989 disability summary plan description contains a similar reservation of rights provision.

In short, we are faced with a clause that provides that Ceridian will pay insurance premiums until an employee is no longer disabled or no longer eligible for the plan and a reservation of rights clause that allows Ceridian to change or discontinue the plan. The conflict between these clauses brings us face to face with difficult contract interpretation questions. Several courts have considered similarly conflicting clauses and have not answered this puzzling question uniformly. See, e.g., Diehl v. Twin Disc, Inc., 102 F.3d 301, 306-09 (7th Cir. 1996); Chiles, 95 F.3d at 1511-14; In re Unisys Corp. Retiree Med. Benefit ERISA Litig., 58 F.3d 896, 902-905 (3rd Cir. 1995); Gable v. Sweetheart Cup Co., Inc., 35 F.3d 851, 855-58 (4th Cir. 1994), cert. denied, 514 U.S. 1057 (1995); Bidlack v. Wheelabrator Corp., 993 F.2d 603, 605-10 (7th Cir.), cert. denied, 510 U.S. 909 (1993). This court recently has addressed this question in Jensen.

In Jensen, a class of retired employees brought suit against SIPCO, their employer, after SIPCO changed its medical benefit plan for retirees. The plan at issue provided that SIPCO would pay medical benefits until a retiree died, or a spouse divorced, or a child married or reached age nineteen. 38 F.3d at 950. Observing that this promise was "at most an ambiguous expression of an intent to vest retiree benefits," id., we then considered the plan's reservation of rights clauses, which provided, "[T]he Company shall have the right and power to alter, amend, or annul any of the provisions of this . . . Plan . . . . Unless otherwise expressly provided therein, amendments shall not be applicable to persons who are receiving pensions hereunder prior to the effective date of such amendment." Id. at 948-49. Focusing on the language which allowed SIPCO to amend or terminate "any of the provisions of th[e] . . . Plan," we held that the reservation of rights provisions at issue were not free from ambiguity. Id. at 950. We observed that "the question at this stage of the analysis is whether these provisions are so unambiguous as to make unnecessary any reference to other Plan provisions and extrinsic evidence." Id. We held that the reservation of rights clauses were "not facially unambiguous--they leave at least some doubt as to whether SIPCO intended to reserve the right to change or terminate benefits to already retired pensioners, or only

the right to make prospective changes for those covered by the Plan but not yet retired." Id. Because of the ambiguity in the plan, we held that the district court properly considered the extrinsic evidence. Id.

The reservation of rights clauses in Jensen and in the plans before us today are materially indistinguishable. Both plans provided a welfare benefit until a person was no longer eligible for the plan, yet retained the right to amend or terminate the plan. Jensen thus controls our analysis, and we hold that Ceridian's plans are ambiguous concerning whether Ceridian can retroactively change benefits to disabled employees. See also American Fed'n of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 980 (2d Cir. 1997) (to reach a trier of fact it is enough to point to written language that could be interpreted as a promise to vest the recipient's benefits).

Ceridian attempts to distinguish Jensen, arguing that the reservation of rights clauses in the two cases differ. Specifically, Ceridian contends that the language in SIPCO's plan states that plan amendments would not apply to persons who are receiving pensions before the date of the amendment unless the amendment said so expressly. Ceridian says this clause made the reservation of rights clauses in Jensen more ambiguous than the clause before us. Jensen, however, did not mention this part of the termination clause in its discussion of the plan's ambiguity. 38 F.3d at 950. In fact, we believe this phrase makes SIPCO's plan even less ambiguous than Ceridian's plan because SIPCO implicitly reserved the right to make retroactive changes to its plan so long as it expressly provided that the amendments would apply to already retired employees. SIPCO expressly sent those employees that already had retired a new summary plan description which contained a new clause. This clause informed the recipients that SIPCO reserved the right to change or amend the plan. Id. at 948. Therefore, the employees in this case have a stronger argument than those who prevailed in Jensen.

In contrast to <u>Jensen</u>'s termination of rights clause, nothing in Ceridian's plan documents imply that Ceridian reserved the right to change the benefits to already disabled employees. To the contrary, Ceridian's plan language provided assurances that previously disabled employees would continue to receive benefits. The reservation of rights clause was tempered by the promise: "If the group Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claims for such benefits will continue as long as you remain totally disabled as defined by the plan."[4] This termination clause is in stark contrast to the termination clause included in the individual health, life, and dental plans. The 1984 summary plan description of the dental and life insurance plan, and the 1983 summary plan description of the health plan provided: "If, while you or your dependents are covered under these plans, the plans terminate or the class of employees of which you are a member has its coverage terminated, then no benefits (including extended benefits) will be payable to you for any charges, fees, or expenses incurred on or after that date of termination of the policy or termination of the class."[5]

The differences in the wording of the termination clauses in the disability plan and the individual health, dental, and life insurance plans indicate Ceridian was more interested in providing continuing payment of insurance premiums to disabled employees than to other employees. The question we are faced with is the amount of greater protection. Ceridian cites <u>Chiles</u>, and argues that Ceridian did not terminate the plan, but simply changed the benefits provided by the plan. Therefore, it concludes that

---

[4]The 1989 summary plan description did not include, nor contradict, this promise. Nonetheless, the promise was included in the formal plan document that was in effect in 1989. We conclude, therefore, that the 1989 Long-Term Disability Plan included this promise.

[5]This quoted language is from the 1984 summary plan description for the dental and life insurance plans. The language for the 1983 health care plan differs slightly, though it is substantively the same.

the termination clause providing for continuation of benefits when the plan is terminated was not triggered. In Chiles, a class of disabled employees filed suit against their employer, Ceridian, arguing that Ceridian violated ERISA when Ceridian changed the benefits it paid to the disabled employees. The Tenth Circuit determined that only termination of the plan would vest disability benefits, rejecting the employees' arguments that the benefits vested once an employee became disabled. 95 F.3d at 1513. The Tenth Circuit held that the long-term disability plan had indeed terminated. Id. at 1516. Accordingly, whatever benefits the termination clause referred to were vested under the language of the plan.[6]

We are satisfied we should not apply Chiles's reasoning to the case before us. Chiles involved former employees of Imprimis, a division of Control Data. See id. at 1508. Unlike the class in Chiles, members of the class before us were not employees of Control Data's Imprimis Division. See id. at 1509-10 n.1. In fact, Chiles points out that a separate class of employees had been formed for the action before us. See id.

Chiles also indicates that Control Data sold Imprimis to Seagate Technology in 1989. See id. at 1508. Before the sale, Chiles's class of employees had been deemed disabled and were receiving disability benefits under a Control Data long-term disability plan. See id. The plan seemed to contain the same provisions as the plan before us as described above, which provided that the Company would pay the premiums for the life, medical, and dental insurance programs in which an employee was enrolled before disability began. As part of the sale, Seagate agreed to administer the Imprimis Division employees' rights according to the terms of the Control Data Plan. See id. Thereafter, Seagate created a new long-term disability plan. See id. All aspects of the administration of the long-term disability plan thus transferred to

---

[6]The Tenth Circuit concluded that a genuine issue of material fact existed concerning what benefits were covered by the termination clause and remanded the case to the district court. 95 F.3d at 1516-19.

Seagate, but Control Data continued to administer the health, life, and dental insurance plans. See id. at 1508-09. Chiles went on to hold that Control Data's long-term disability plan terminated after the sale of Imprimis Division, as none of the Control Data disability plan operation and administrative procedures remained in effect. Id. at 1516.

Nothing in the record before us indicates that a similar course of transactions occurred with respect to the plans applicable to the parties in this case.

We also observe that other circuits have criticized the reasoning upon which Chiles is based. For example, in evaluating an ERISA plan in Diehl, the Seventh Circuit specifically concluded that it "need not undertake such interpretive gymnastics" as used in Chiles. See 102 F.3d at 307. In Grain Millers, the Second Circuit observed that Chiles required that the right to receive lifetime coverage must be found in plan documents and stated in clear and express language. 116 F.3d at 980. Grain Millers, however, emphasized that this was not the law of the Second Circuit. Id. The Second Circuit required only that an employee point to written language capable of reasonably being interpreted as creating a promise of vested benefits in order to reach a trier of fact. Id.

Further, Chiles itself pointed out that recent cases from other circuits were not uniform in determining whether a general reservation of rights clause unambiguously controls a separate promise of benefits upon retirement. Chiles, 95 F.3d at 1511-12. It specifically contrasted the difference in the Third Circuit's decision on this issue as demonstrated in In re Unisys, 58 F.3d at 904 (a general reservation of rights clause unambiguously controls a separate promise of benefits upon retirement), with the approach of this circuit as demonstrated in Jensen, 38 F.3d at 950 (two general reservation of rights clauses not facially unambiguous). Id. at 1512. Though in Chiles the Tenth Circuit followed the In re Unisys approach, Jensen is a recent well-reasoned

opinion of this circuit that we are bound to follow. Therefore, <u>Jensen</u> provides a roadmap for our analysis in the case before us today.

The disability plan provides that Ceridian will pay the health, life, and dental premiums for disabled employees until they are no longer disabled. In support of this promise, the plan assured that if the plan was terminated, benefits would continue for any employee totally disabled when the plan terminated. Courts have a duty to interpret different clauses of a contract in a harmonious fashion, giving meaning to all clauses where possible.

> [A]n elementary rule of contract interpretation is that a contract should be construed so as to give effect to all the contract's provisions. Similarly, if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in order to avoid rendering either one nugatory.

<u>Johnson Controls, Inc. v. City of Cedar Rapids</u>, 713 F.2d 370, 374 (8th Cir. 1983) (citation and quotation omitted). When reading plans "[e]ach provision should be read consistently with the others and as part of an integrated whole. Further, the terms must be construed so as to render none of them nugatory and to avoid illusory promises." <u>DeGeare v. Alpha Portland Indus., Inc.</u>, 837 F.2d 812, 816 (8th Cir. 1988), <u>vacated and remanded</u>, 489 U.S. 1049 (1989).[7] Here, if Ceridian faced no limit on its ability to change the level of benefits paid to disabled employees the coverage could become all

---

[7]The Supreme Court's remand of <u>DeGeare</u> was based on its decision in <u>Bruch</u>. In <u>DeGeare</u>, we held that a plan's fiduciary's interpretation of plan terms was entitled to deference on review. 837 F.2d at 814-15. Our discussion, however, did not end there, and we went on to hold that the administrator correctly construed the plan documents. <u>Id.</u> at 815. We then applied basic contract interpretation law established in our circuit. <u>Id.</u> at 815-16. <u>Bruch</u>'s holding does not affect the contract interpretation principles discussed in the central part of <u>DeGeare</u> and thus, the basic contract interpretation principles of <u>DeGeare</u> still apply. <u>See</u> <u>Howe v. Varity Corp.</u>, 896 F.2d 1107, 1109 n.4 (8th Cir. 1990).

but nominal and make the promise of lifetime benefits illusory. Thus, the employees would be entitled to few or no benefits, but the termination clause still would not be applicable to protect the benefits received by those already disabled at the time of termination. See Diehl, 102 F.3d at 309-10 (determining that if a company was allowed to modify coverage until it became all but nominal, the promise of lifetime benefits would look rather illusory, and therefore reading the plans to require the company to expend reasonable efforts to keep benefits at a level commensurate with benefits provided under the original agreement).

In short, we hold that the reservation of rights clauses at issue here and in Jensen are materially indistinguishable. The reservation of rights clauses, read with the language promising that Ceridian will pay insurance benefits until an employee is no longer eligible for the plan, and with the language promising that Ceridian will continue paying benefits to disabled employees at the time of the plan termination, is ambiguous.

**IV.**

Where a contract is ambiguous, a court may weigh extrinsic evidence. The district court, after concluding that the termination and amendment clauses defeated the employees' claim for vested premium payments, also considered the extrinsic evidence. The district court concluded that the extrinsic evidence did not help the employees, because the only extrinsic evidence before the court indicated Ceridian's intent to reserve its right to change all aspects of the disability benefit plans.

Some of the more significant extrinsic evidence offered by the employees included the fact that before 1994 Ceridian had made only prospective changes to the disability benefits provided under the long-term disability plan. Second, the employees offered the affidavit of Barker, one of the class representatives. Barker spent his entire career working in the area of employee benefits. He worked for Ceridian as the Manager of its Corporate Employee Benefits Department from 1968 to 1975. In this

position Barker was responsible for many aspects of the individual domestic corporate employee benefits, including the design, administration, communication, and funding of Ceridian's health, life, dental, disability, and retirement plans.  In 1986, Ceridian rehired Barker as its principal consultant for international employee benefits. At this time he also provided support for Ceridian's domestic personnel relations, primarily in the health, life, and disability benefit areas.  In his affidavit Barker stated that he went on long-term disability status in 1988, relying on Ceridian's promises, that for as long as he was disabled, he would receive 60% of his wages and 100% of welfare benefits premiums.  Though Barker knew that the benefits could be changed, Barker never believed that Ceridian could retroactively change its obligation to pay the insurance premiums.

We observe that the extrinsic evidence presented by the employees is similar to the extrinsic evidence offered in Jensen.  In Jensen, the extrinsic evidence offered at trial included evidence that the company's former employee relations manager had considered medical benefits to be a vested benefit and that the company previously had made only prospective changes to retiree medical benefits.  38 F.3d at 951.   The evidence offered by the employees here is more than enough to show that a genuine issue of material fact exists concerning whether Ceridian could change its long-term disability plan retroactively and refuse to pay the insurance premiums for the disabled employees.

Accordingly, we remand to the district court for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.