# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-1434

_____

| | | |
|---|---|---|
| Kent P. Barker; Carla J. McAndrews; | * | |
| Martin J. Timmons, on behalf of | * | |
| themselves and all others similarly | * | |
| situated, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Ceridian Corporation, a Delaware, | * | |
| corporation, individually and as | * | |
| successor in interest to Control Data | * | |
| Corporation, | * | |
| | * | |
| Defendant - Appellee.. | * | |

_____

Submitted:  May 11, 1999

Filed:  October 21, 1999

_____

Before McMILLIAN, JOHN R. GIBSON, and FAGG, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

This ERISA welfare benefits case comes before us a second time, after a bench trial and a judgment in favor of Ceridian Corporation, the employer. Kent Barker, Carla McAndrews, and Martin Timmons, on behalf of themselves and a class of Ceridian employees who were disabled before January 1, 1991, sued to recover benefits under Ceridian's[1] long-term disability plan, specifically payment of their health, dental, and life insurance premiums. Before 1994, Ceridian had paid these premiums for employees on long-term disability, but effective January 1, 1994, Ceridian required the disabled employees to pay part of the costs for their insurance. The district court initially entered summary judgment for Ceridian, but we reversed for a trial on the issue of whether Ceridian had originally intended the right to payment of these premiums to vest once a participant became disabled. Barker v. Ceridian Corp., 122 F.3d 628 (8th Cir. 1997) (Barker I). The district court tried the case and found that the class did not prove Ceridian had any such intent. The class appeals from the district court's ruling that Ceridian never intended to give disabled employees a vested right to payment of their insurance premiums. We reverse and remand.

Ceridian's long-term disability benefits consisted of two components, one of which was paid for by employee contributions and one of which was paid for by Ceridian. The income protection component guaranteed disabled employees income payments of 60% of their pre-disability salary; in order to make the income payments tax deductible, this benefit was funded by employee contributions. The other component was the payment of health, dental and life insurance premiums for disabled employees; this benefit was paid for by Ceridian, without employee contribution.

Although Ceridian had an informal practice of paying insurance premiums for disabled employees before 1976, this benefit first appeared in Ceridian's ERISA plans in 1977, when it was briefly mentioned in Ceridian's summary plan description for its

_____

[1]Ceridian was formerly called Control Data Corporation, but we will use the current name Ceridian throughout this opinion.

disability plan. The 1978 disability plan summary was the first plan document that clearly described the benefit. The summary plan descriptions changed from year to year, but in Barker I we identified three critical clauses that recurred in the summary plan descriptions: the promise of the insurance premium benefit, the termination clause, and the reservation of rights. See 122 F.3d at 630-31.

In Barker I we quoted the description of the insurance premium benefit from the 1986 summary plan description: "While on Long-Term Disability Status the company will pay the premiums for all the company-sponsored benefits (medical, life, and dental) for which you and your dependents were enrolled before your disability began. The company will continue paying all premiums until you and your dependents are no longer eligible for the plans." Id. at 635. Similar language is found in the 1978, 1980, 1982, and 1985 summary plan descriptions and in the 1989 Employee Benefits Manual.

We also considered relevant the clause advising participants of their rights in the event the long-term disability plan terminated: "If the group Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claims for such benefits will continue as long as you remain totally disabled as defined by the plan." Id. at 636.

In contrast to the premium benefits clause and the termination clause, which appear to promise benefits for the future, the reservation of rights clause reserves to Ceridian broad rights to amend the plan. The 1983 and 1986 summary plan descriptions stated: "[Ceridian] expects to continue the Long-Term Disability Plan indefinitely, but must reserve the right to change or discontinue it if it becomes necessary. This would be done only after careful consideration." Id. at 635.

In Barker I, 122 F.3d at 638, we concluded that our case was governed by the reasoning of Jensen v. SIPCO, Inc., 38 F.3d 945 (8th Cir. 1994). In construing a reservation of rights clause in Jensen, we reasoned that we should interpret ERISA

documents in accordance with the law of trusts. 38 F.3d at 950. Trusts law allows us to admit extrinsic evidence if the intent of the settlor cannot be ascertained by examination of the trust instrument itself (here, the formal ERISA plan and the summary plan descriptions). Id. We held in Barker I that the reservation of rights in this case, as in Jensen, 38 F.3d at 950, was ambiguous, since it was not clear whether the reservation of rights preserved the right to amend the plan only as to those who would become entitled to the benefits in the future, or also as to those already on disability. 122 F.3d at 638-39. The latter reading would render the premium benefit clause virtually nugatory: "Here, if Ceridian faced no limit on its ability to change the level of benefits paid to disabled employees the coverage could become all but nominal and make the promise of lifetime benefits illusory." Id. at 638. Cf. American Fed'n of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 983 (2d Cir. 1997) (reserving question of "whether a specific promise of vested benefits can be defeated by a general reservation of the right to amend or terminate a plan").

In addition to the ambiguity of the reservation of rights, this case presented the additional factor of the termination clause language that seemed to grant a promise of future benefits. Barker I, 122 F.3d at 637-38. We held that applying the general reservation of rights clause to participants who were already disabled would render illusory the promise that disabled participants would continue to receive benefits in the event of the plan's termination. Id. at 638.

In light of these two sources of ambiguity, we remanded for the district court to take extrinsic evidence on the issue of whether Ceridian intended benefits to vest at the time of disability. Id. at 638.

At trial, the class presented several types of evidence relevant to whether Ceridian had intended the summary plan descriptions to convey a promise of future benefits and whether the reservation of rights was meant to apply to already disabled participants.

-4-

First, the class presented the testimony of plan participants, such as class representative Kent Barker, that they believed the reservation of rights would not apply to participants already on disability.

Second, and related, the class presented testimony that Ceridian's representatives had told participants they could not lose the premium benefits once they were disabled. One participant, Barbara Proehl, testified that a Ceridian personnel representative told her that the reservation of rights would not allow the company to change benefits once a participant was disabled. In the same vein, former Ceridian management, including James Morris, Ceridian's former Vice President of Compensation, testified not only that this was their understanding of the reservation of rights, but also that this was how they explained the plan to employees. Morris testified that he viewed the disability premium benefit as vested once a participant became disabled, and that he "definitely" used the word "vested" in describing this benefit to the people who worked for him.

Third, the class presented evidence that in 1991 Ceridian amended the premium benefit to require participants who would become disabled in the future to pay part of the cost of their insurance premiums, but that the change was not made applicable to those already on disability.

Finally, the class presented the testimony of Donald Shovein, the Ceridian Director of Employee Benefits from 1975-81, who was in charge of preparing Ceridian's employee welfare plans. Shovein drafted the 1977 summary plan description and oversaw the preparation of later summaries. Shovein testified:

Q: Based on your experience as a benefits manager in 1976 when you were forming this plan, did you have an understanding as to whether– once a person became disabled–the disability benefits could be changed or taken away?

A: My understanding was clearly that it could not.

Shovein testified that he tried to communicate this understanding to Ceridian's employees through "the various media or vehicles I mentioned earlier," referring to the summary plan descriptions. Shovein specifically addressed the reservation of rights clauses that he drafted for the summary plan descriptions. He intended that the reservation of rights would have no effect on those who were already disabled, and he tried to express that intent in the summary plan descriptions. Shovein presented the summaries to the Ceridian board of directors before they were distributed, and he testified he recalled no discussion at the board of directors level about the reservation of rights issue.

Ceridian's evidence consisted of the testimony of John Schmidtke, the lawyer who drafted Ceridian's formal long-term disability plan, and of Michael Kotten, who had served as Ceridian's plan administrator at the time Ceridian made the decision to require currently disabled employees to pay part of their own insurance premiums. Schmidtke's first involvement with the Ceridian long-term disability benefit plan came in 1980, when he drafted the formal plan. Schmidtke's practice was to ascertain Ceridian's intent by holding plan design meetings and telephone conversations, and then to send his drafts to his contact at Ceridian–usually Donald Shovein. Schmidtke testified, "It was a back and forth kind of thing until everyone was on the same page." Schmidtke did not include the insurance premium benefit in the long-term disability plan, and indeed the formal plan does not include this benefit. He did, however, include a broad reservation of rights which differed from the sort of clause that he included in pension plans, which provided a vested benefit. In pension plans, the reservation of rights would include a proviso such as, "Providing, however, that no amendment can retroactively affect the accrued benefit." The formal long-term disability plan's reservation has no such proviso recognizing the existence of vested rights under the plan.

In addition to his testimony about the reservation of rights in the formal plan, Schmidtke also testified about the function of the termination clause promising that, in

the event of termination, participants already on disability would continue to receive benefits. Schmidtke explained that the disability income replacement benefit was funded by employee contributions, so that when a disabled employee received the payments, they would be tax deductible. Once Ceridian collected employee contributions, they were kept in a long-term disability trust. The termination clause provided that if the plan terminated the trust would continue to pay benefits until the funds in the trust were depleted. The premium benefit, on the other hand, was paid for by Ceridian, not out of the long-term disability trust. Schmidtke testified: Q: "Does this provision [termination clause in formal plan] as you understand it have any application whatsoever to the premium benefit?" A: "No."

Kotten testified that as plan administrator in the early 1990s, he had interpreted the plan documents to permit Ceridian to amend the premium benefit provided to participants already out on disability. Kotten had nothing to do with drafting the plan documents, having first assumed responsibility for employee benefits on a corporate-wide basis in October 1989.

In its ruling, the district court focused on the function of the termination clause. The court credited Schmidtke's explanation, finding, "[T]he language of the termination clause was never intended to apply to the premium payment benefit but was meant only to apply to the long-term income protection portion of the disability benefits." The court rejected the relevance of Barker's testimony about his understanding of the plan documents, because the premium benefit had evolved at a time when Barker was not employed at Ceridian. The court did not directly address the probative value of the testimony by Ceridian management that they meant to provide vested benefits that were not subject to the reservation of rights; testimony that Ceridian personnel administrators informed participants that the premium benefit could not be amended after they were out on disability; and the evidence that the amendment to the premium benefit in 1991 was made applicable only to those who would become disabled in the future. Instead, the court made only the following general findings:

-7-

No evidence was adduced to support plaintiffs' claim that, because disabled persons were "out on claim," the premium payment benefit could not be changed. That benefit was not dependent on an ongoing status, such as disability, and therefore, the "out on claim" concept had no application to the payment of the premium benefit.

All witnesses agreed that companies that provide welfare payment benefits must have the flexibility to change them in the face of changing economic circumstances. The court finds that Ceridian made its change to the premium payment welfare benefit based on a careful consideration of the economic factors and it was Ceridian's intent to retain the power to make the change which is the subject of this action.

This case hinged on the meaning of ambiguous instruments, which the court was to ascertain by examining extrinsic evidence of the settlor's intent. Barker I, 122 F.3d at 638. The district court's determination of the settlor's intent in executing an ambiguous instrument is a question of fact, reviewable only for clear error. See Ventura v. Titan Sports, Inc., 65 F.3d 725, 731 (8th Cir. 1995), cert. denied, 516 U.S. 1174 (1996); Mohamed v. Unum Life Ins. Co., 129 F.3d 478, 480 (8th Cir. 1997) (citing Minnesota law); 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 2.23 (2d ed.1992). A finding that is contrary to the only testimony presented on a question may properly be considered clearly erroneous. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 571 (2d Cir. 1991).

The class contends that the district court failed to comply with our instruction in Barker I to examine extrinsic evidence to determine Ceridian's intent in promulgating the plan documents. Ceridian responds that the district court examined extrinsic evidence concerning the purpose of the termination clause. According to Ceridian, once the court found that the termination clause's assurance of continued coverage after disability did not apply to the premium benefit, that finding disposed of the entire case: "[T]he district court's findings that the termination clause provided plaintiffs no support

on the merits were dispositive, since there was no other basis in any of the language of the plan on which to find vesting."

Ceridian is clearly correct that the district court found the termination clause did not apply to the premium benefit and so could not provide a vested right to the premium benefit. However, eliminating the termination clause does not resolve the entire case. We based our opinion in <u>Barker I</u> on the ambiguity of the reservation of rights clause as well as the termination clause. We held that the reservation of rights clauses in this case were "materially indistinguishable" from those held ambiguous in <u>Jensen</u> (in which there was no comparable termination of plan clause). <u>Barker I</u>, 122 F.3d at 635. The district court's opinion focused on the termination clause, but ignored the other abundant evidence that Ceridian did not intend the premium benefit to be amendable with respect to a participant who was already disabled.

The district court did not directly address the question of whether Ceridian intended that reservation of rights to apply to those already on disability, except to say that "no evidence was adduced" to support the class's interpretation. This statement cannot be squared with a record replete with testimony of Shovein, who drafted the language in issue, that he had intended the reservation of rights in the summary plan descriptions to apply only to those who would become disabled in the future, not those already on disability. This evidence had direct and vital relevance to the issue of whether Ceridian intended benefits to vest upon disability.

Furthermore, there was abundant evidence that Ceridian's employee benefits representatives interpreted the reservation of rights as applicable only to those not already on disability. Barbara Proehl testified that she specifically asked a personnel representative about the meaning of the reservation of rights and was told that it would not allow the company to change benefits once a participant was disabled. James Morris, Ceridian's Vice President of Compensation at the relevant time, testified that this was his understanding of the meaning of the language and this was how he explained

the plan to his employees. Informal statements by an employer's representatives about benefits do not legally alter an ERISA plan, which is required by statute to be written. Jensen, 38 F.3d at 949. "ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise." Palmisano v. Allina Health Systems, Inc., No. 98-3619, 1999 WL 701503 at *5 (8th Cir. Sept. 10, 1999) (quoting Houghton v. SIPCO, 38 F.3d 953, 958 (8th Cir. 1994)). However, in a case involving ambiguous written instruments, the contemporaneous interpretation of the instrument by the employer is relevant evidence as to the settlor's intent. Fink v. Union Cent. Life Ins. Co., 94 F.3d 489, 492 (8th Cir. 1996); see Jensen, 38 F.3d at 951. Again, the district court's statement that there was "no evidence" supporting the class's interpretation of the plan convinces us that the district court did not recognize the significance of the evidence before it.

Evidence that an employer has in the past limited plan changes to those who were not yet in claim status is sometimes relevant, see Jensen, 38 F.3d at 951, and sometimes not, see Howe v. Varity Corp., 896 F.2d 1107, 1110 (8th Cir. 1990), depending on the surrounding circumstances. At the least, Ceridian's 1991 amendment to the premium benefit, which affected only participants who were not already on disability, is consistent with the testimony of the executives who said they understood that changes could only affect future disability claimants, not those already on disability at the time of the change.

Ceridian argues that we should assume that the district court made credibility determinations rejecting the class's evidence. There are several reasons why we cannot do so. First, the district court's opinion was not a highly condensed ruling in which all issues were treated summarily. The district court explicitly rejected the relevance of Kent Barker's testimony, explaining that Barker was not at Ceridian during the relevant times and therefore had no knowledge of Ceridian's intent in promulgating the summary plans. The district court was unlikely to go into this level of detail regarding one of the class's witnesses and then reject without comment the crucial testimony of Shovein, Proehl and Morris if the court recognized the relevance of those witnesses' testimony.

-10-

Second, the district court stated that there was "no evidence" to support the class's interpretation, which is quite different from rejecting relevant evidence as not credible. Finally, the class's evidence concerning Ceridian's intent in publishing the summary plan descriptions beginning in 1978 is the <u>only extrinsic evidence</u> offered on the meaning of the summary plan descriptions generally or the reservation of rights in those descriptions specifically. Ceridian offered the testimony of John Schmidtke, the scrivener of the formal plan, who did not recall discussing with anyone from Ceridian "what was intended about the reservation of rights clause." Schmidtke did not become involved with the long-term disability plan until 1980, and then he only drafted the formal plan, not the summary plan which is the source of the rights on which the class relies. Schmidtke did not recall seeing the summary plan descriptions at the time they were created. Therefore, his testimony does not conflict with Shovein's testimony about the meaning of the summary plan description drafted in 1978, as Ceridian contends, and the district court could not have relied on Schmidtke in rejecting Shovein's testimony.

Ceridian argues that the class cannot rely on the summary plan descriptions because they instructed the reader to consult the formal plan in the event of uncertainty about meaning. Ceridian contends that the formal plan made the reservation of rights applicable to "all Participants," and therefore the reservation clearly applies to currently disabled participants. Where the formal plan and the summary plan description conflict, the employer is bound by the provisions of the summary plan description. <u>Marolt v. Alliant Techsystems, Inc.</u>, 146 F.3d 617, 620-21 (8th Cir. 1998) (summary plan prevailed even where the summary referred the reader to the formal plan for "[c]omplete details"); <u>Barker I</u>, 122 F.3d at 633. This rule is particularly well-founded in a case such as this one, where the formal plan was not routinely distributed to employees, but only made available upon request. Donald Shovein testified that he remembered "a time or two" when employees asked for the formal plan, but it happened "very very infrequently." The class's evidence showed the summary plan's reservation of rights did not apply to currently disabled participants. Accordingly, even if the formal plan were

drafted with a contrary intent, we would have to give precedence to the summary plan descriptions.

In sum, Barker I identified the reservation of rights in the summary plan descriptions as a source of ambiguity. 122 F.3d at 638. Ceridian did not present testimony of persons having knowledge of Ceridian's intent in drafting the summary plan descriptions' reservations of rights. The class presented the testimony of the drafter, Donald Shovein, that the reservation of rights was meant to apply only to those participants who were not on disability at the time of any future amendment. Ceridian's decision to make the 1991 amendment applicable only to those not already on disability corroborates this testimony. The class also presented testimony from others, including James Morris and Barbara Proehl, that Ceridian so interpreted the reservation of rights at the time it promulgated the summary plan descriptions. The district court's complete disregard of the only relevant testimony explaining Ceridian's intent regarding the reservations of rights in the summary plan descriptions makes the court's findings clearly erroneous.[1]

We therefore must reverse and remand for entry of judgment in favor of the class. However, we decline to consider the question of appropriate relief because the district court has not reached that issue. Accordingly, we remand for further proceedings consistent with this opinion.

---

[1]The class argues that the district court's findings regarding the termination clause were based on evidence lacking a foundation. However, the class repeatedly asserts that the termination clause is not the source of ambiguity in the plan documents. Therefore, we need not scrutinize a finding which is irrelevant to the class's theory of recovery.

-12-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.